| | | |
|---|---|---|
| RETURN DATE: JULY 16, 2019 | : | SUPERIOR COURT |
| DAVID BASAK-SMITH DVM | : | J.D OF FAIRFIELD/BRIDGEPORT |
| V. | : | AT BRIDGEPORT |
| SPECTRUM BRANDS, INC<br>UNITED INDUSTRIES CORPORATION | : | June 12, 2019 |

## COMPLAINT

COUNT ONE: BREACH OF PRODUCTS LIABILITY

1. At all times mentioned herein, the Plaintiff, David Basak-Smith DVM, was a resident of Easton, Connecticut.

2. At all times mentioned herein, Defendant, Spectrum Brands, Inc ("Spectrum") was a Delaware Corporation based in Madison, Wisconsin operating as a subsidiary of Spectrum Brands Holdings, Inc.

3. Spectrum manufactures and sells small appliances, consumer batteries, lawn and garden, electric shaving and grooming, residential locksets, pet supplies, and household insect control including the brand CUTTER.

4. At all times mentioned herein, Defendant, United Industries Corporation ("UIC") was based in St. Louis, Missouri operating as a subsidiary of Spectrum Brands, Inc.

5. UIC manufactures and sells consumer products for home, lawn, and garden insect and weed control markets in the United States offering its products under numerous brand names including CUTTER.

6. Defendants were engaged in the business of designing, manufacturing, distributing and selling in retail stores personal and backyard insect repellants including the brand name CUTTER, and did so with the expectation that these products would be shipped, purchased and used in Connecticut by the Plaintiff.

7. In 2017, the Plaintiff purchased at Costco a package of three CUTTER NATURAL aerosol outdoor foggers which can conspicuously displays the words "KILLS MOSQUITOES BY

    CONTACT SAFE FOR USE AROUND CHILDREN AND PETS CONTAINS LEMONGRASS OIL A NATURAL INSECTICIDE."

8. On or about May 17, 2017 Plaintiff and his wife were working in the yard at their residence in Easton raking and cleaning up grass and brush and the like and disposing of brush by burning.

9. In the yard available for use were several sprays and lotions to repel insects such as mosquitos including an aerosol can of CUTTER NATURAL.

10. Plaintiff's wife sprayed herself with CUTTER NATURAL and Plaintiff who was being bitten followed suit picking up the CUTTER NATURAL observing the front of the can to say, "KILLS MOSQUITOS BY CONTACT SAFE FOR USE AROUND CHILDREN AND PETS CONTAINS LEMONGRASS OIL A NATURAL INSECTICIDE."

11. Plaintiff who had been cycling earlier, applied the product by spraying his legs below his cycling pants from the knees down as well as his exposed arms; the fluid dripped from the nozzle down his right arm.

12. Returning to his yard work, Plaintiff approached the burning brush pile and was instantly consumed with flames on his exposed skin on arms and legs and especially his right arm where the spray had dripped.

13. Plaintiff suffered second-degree burns affecting the epidermis and dermis causing pain, redness, swelling, and blistering, and some third-degree burns going through the dermis affecting deeper tissue resulting in white and blackened, charred skin numb in places.

14. Plaintiff on May 18, 2017 was admitted for his extensive thermal burns to the Bridgeport Hospital Burn Center, the only dedicated burn center in Connecticut and one of only 62 certified burn centers in the United States.

15. The Plaintiff remained from Friday May 19, 2017 through Thursday May 25, 2017 requiring extensive skin grafts utilizing genetically modified pig's skin to both legs and right arm.

16. While in the Bridgeport Hospital Burn Center the Plaintiff, who had previously suffered from colon cancer, developed a complication of peritonitis with inflammation of the

peritoneum, the lining of the inner wall of the abdomen and cover of the abdominal organs causing severe pain, swelling of the abdomen, and fever.

17. This complication, discovered Monday May 22, 2017, required emergency resection to remove infected tissue and the localized collection of pus or abscess built up within Plaintiff's stomach.

18. Plaintiff underwent a surgical procedure creating a long-term opening, permanent cut, incision or stoma, a resection of his intestines and bowel diversion rerouting the normal movement of intestinal contents out of the body through the abdominal wall so that Plaintiff's waste exists through the abdominal wall instead of passing through the anus.

19. The Plaintiff has since had a removable external collection pouch, called an ostomy appliance which is a prosthetic medical device to collect his stool, and is suffering from excessive gas, skin irritation, stoma problems, diarrhea, electrolyte imbalance, vitamin B12 deficiency, phantom rectum and rectal discharge of mucus.

20. Plaintiff is now forced to attach, drain, and change the ostomy pouch several times a day and care for the stoma and surrounding skin requiring him to wipe away mucus on the stoma, clean the skin around the stoma with warm water and wash cloth, rinse the skin thoroughly and dry the skin completely.

21. Plaintiff must limit his liquids with meals, drink plenty of liquids between meals, maintain regular eating, avoid high-fiber foods, introduce new foods gradually, and chew thoroughly.

22. Plaintiff has scheduled additional surgery in attempt to lower or reverse his ostomy but has the prospect of carrying the external ostomy bag or pouch for his lifetime with its difficulties and costs.

23. At all times mentioned herein, the can of CUTTER NATURAL reached the Plaintiff without any change in conditions when manufactured and sold.

24. At all times mentioned herein said can of CUTTER NATURAL was used and employed by Plaintiff for the purpose for which it was designed, produced, manufactured, tested and sold, to wit insect repellant; and was used in a manner foreseeable to the Defendants.

25. The Defendants are legally responsible to the Plaintiff for his personal injuries complications, losses and damages as a result of the defective and /or unreasonably dangerous aerosol can of CUTTER NATURAL pursuant to the Connecticut Products Liability Act (C.G.S. Section 52-572m, et seq.) in one or more of the following ways and said wrongful conduct is the proximate cause of Plaintiff's injuries, losses and damages, and said act or lack thereof was also in reckless disregard of the safety of consumers, as set forth below:

    a. A reasonably alternative design showing the consumer not to apply to their skin could have reduced or avoided the danger;

    b. A reasonably alternative design or warnings showing the consumer the product's extreme flammability could have reduced or avoided the danger;

    c. The can's external design is manifestly unreasonable in that the risk of harm from the product so clearly exceeds its utility that a reasonable, informed consumer would not purchase the product;

    d. An alternative design was technically and economically feasible by simple markings warning not to spray on the body and contents extremely flammable which would have reduced or avoided harm;

    e. The product was defective as the product clearly leads the consumer to believe it "safe for use around children and pets;"

    f. The product was defective as it leads the consumer to believe it is all Natural and only contains lemongrass oil;

    g. The Defendants so negligently, carelessly and unreasonably designed and sold the product without warnings clearly marked either to not spray on oneself or that it is extremely flammable that it was dangerous and unsafe for its foreseeable use as an insect repellant;

    h. The Defendants did not adequately warn of the particular risks of using on one's person and its flammability which was known or knowable considering the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution;

i. The Defendants failed to provide adequate warning as aforesaid to users and consumers;
j. The Defendants could reasonably foresee danger or injury or damage to another less knowledgeable, unless they were warned of the danger;
k. The Defendants had a duty to warn of foreseeable dangers inherent in the use of the product, and the duty to provide adequate instructions for its safe use;
l. Such warnings were feasible, yet here inadequate and not effective;
m. The manner of use by the Plaintiff was or should have been reasonably foreseeable by Defendants, and the resulting injuries were reasonably foreseeable;
n. The dangers of use of the product as herein was not clearly apparent and a reasonable consumer could not appreciate the danger without the need of warning;
o. Based on the risk-benefit calculus the benefits of providing warnings were not outweighed by the cost of providing warnings, which were de minimous;
p. The dangers were not widely or actually known by consumers, especially as the Defendants marketed many insect repellants that were to be applied to skin and not flammable;
q. The risks were not remote, obviously reasonably foreseeable and so egregious as to mandated appropriate warning conspicuously displayed;
r. The Defendants failed to take adequate measures to communicate the warnings to the ultimate user;
s. The Defendants failure to provide warnings that, if communicated, were adequate to apprise the user of the product's potential risks;
t. The Defendants warnings, if any, were not adequate, effective, conspicuous and were not of a character reasonably calculated to bring home to the reasonably prudent user the nature and extent of the danger involved;
u. The warnings, if any, were not such as to capture the attention of the reasonably prudent product user during use;
v. The warning, if any, were not comprehensible to the average user nor conveyed a fair indication of the nature and extent of the dangers;

    w. The warning, if any, did not possess a degree of intensity that would cause a reasonable person to exercise caution commensurate with the potential dangers;

    x. The warnings, if any, were inadequate in factual content, in expression of facts, and in the method by which it was conveyed;

    y. The warnings were: not conspicuous, so as to assure attention will be attracted to the warning; such that symbols were appropriate; insufficient to communicate the risk of danger or risk of harm associated with the product; not located where the user was likely to encounter it; not clear and unambiguous; not sufficiently broad and encompassing and were unduly limited in scope; at best so diluted as to negate the very dangers the warnings involved;

    z. The Defendants decision how to warn, or not provide adequate warning was unreasonable under the circumstances and in reckless disregard for the safety of consumers.

26. Had the Defendants supplied adequate warnings, the Plaintiff would have altered his behavior to avoid injury, and but for the absence of warning the injuries would not have occurred.

27. The Plaintiff completed his undergraduate degree at Cornell University in 1985 as an Animal Science major and proceeded to graduate from Cornell's College of Veterinary Medicine in 1989. Prior thereto Dr Basak-Smith served four years in the United States Air Force on a HELICOPTER RESCUE TEAM as A Special Forces PARA-RESCUE MAN. He was tasked with recovery and medical treatment of personnel in humanitarian and combat environments. Plaintiff is an educated professional who suffers from far sightedness or the need for reading glasses.

28. The front of the can of CUTTER NATURAL other than clearly saying SAFE FOR USE AROUND CHILDREN AND PETS less conspicuously states CONTAINS LEMONGRASS OIL A NATURAL INSECTICIDE. Then in smaller letters at bottom of front of can states ACTIVE INGREDIENT: LEMONGRASS OIL 3% INERT INGREDIENTS 97%* TOTAL 100%  *WATER, MINERAL OIL, WINTERGREENOIL, ISOPROPL ALCOHOL, CARBON DIOXIDE, POLYGLYCEROL OLEATE, SODIUM BENZOATE;

opposite these ingredients on the front side it states KEEP OUT OF REACH OF CHILDREN ; CAUTION SEE BACK FOR ADDITIONAL PRECAUTIONARY STATEMENTS. NET WT 14 OZ (396g).

29. On the back of the can it states SPRAY IN THE AIR TO KILL MOSQUITOES & OTHER FLYING INSECTS BY CONTACT (in orange background), then CUTTER NATURAL IS A LINE OF INSECT REPELLANTS THAT ARE SAFE FOR USE AROUND CHILDREN AND PETS. THE FORMULA, MADE WITH NATURAL ACTIVE INGREDIENTS, HAVE BEEN TESTED TO ENSURE THEY ARE EFFECTIVE AGAINST MOSQUITOES AND OTHER FLYING INSECTS. CUTTER NATURAL- REPELLING INSECTS THE NATURAL WAY. Beneath this are the directions for use in small lettering: SHAKE WELL BEFORE USING. POINT SPRAY NOZZLE AWAY FROM FACE. HOLD CAN AT A SLIGHT UPWARD ANGLE. FOR BEST RESULTS, SPRAY WHEN AIR IS CALM. ALLOW A FEW MINUTES FOR PRODUCT TO TAKE EFFECT. SPRAY WITH WIND IF BREEZE IS BLOWING (I.E. UNDER 5 MPH). It then describes the FLYING INSECTS and how to spray in the air and warns DO NOT DIRECTLY SPRAY PLANTS OR SHRUBS AS INJURY TO FOLIAGE MAY RESULT. Then it has STORAGE AND DISPOSAL with its suggestion of a cool dry place out of reach of children. Finally, it has PRECATIONARY STATEMENTS under hazards to humans and animals and in a note of caution it states CAUSES MODERATE EYE IRRITATION. AVOID CONTACT WITH EYES OR CLOTHING. WASH THOROGHLY WITH SOAP AND WATER AFTER HANDLING AND BEFORE EATING, DRINKING, CHEWING GUM OR USING THE TOILET. For first aid it discusses flushing your eyes. Then under heading PHYSICAL OR CHEMICAL HAZARDS in small lettering it states: "Contents under pressure. Do not use or store near heat or open flame. Do not puncture or incinerate container. Do not expose to heat or store at temperature above 120F. Further down it notes: United Industries Corporation represents that this product is a minimum risk pest control product and qualifies for exemption from EPA registration under Federal [law].
30. Nowhere on the front of the can does it say not to spray on skin.
31. Nowhere on the front of can does it say contents are extremely flammable.
32. The Caution and first aid on back mainly refer to eye irritation and the need to flush one's eyes.

33. Nowhere on the back of the can does it state not to spray on flesh.
34. The Defendants knew or should have known that the percentage of isopropyl alcohol noted as part of the 97% inert ingredients was extremely high and inherently dangerous. When sprayed on a table the contents ignite easily and burn with a blue flame.
35. Isopropyl alcohol commonly called isopropanol or rubbing alcohol is a colorless, flammable chemical compound with a strong odor whose main hazard is its extreme flammability and usually has a warning sign of an exclamation mark or a fire in a red box. It is a common ingredient in antiseptics and disinfectants. Isopropyl alcohol vapor is denser than air and flammable, with a flammability range or explosive limits of between 2 and 12.7%. Its Flash point in an open container is at 53.1 degrees Fahrenheit; is It is a known skin irritant. ISOPROPYL ALCOHOL IS HIGHLY FLAMMABLE AND CAN EASILY IGNITE AS ITS VAPORS MAY FORM EXPLOSIVE MIXTURES WITH AIR, TRAVELING TO A SOURSE OF IGNITION AND FLASH BACK; IT SHOULD BE KEPT AWAY FROM HEAT, SPARKS, FLAMES AND OTHER SOURSES OF IGNITION.
36. The Defendants filed a Material Safety Data sheet on 9/2/2016 which complied with OSHA's Hazard Communication Standards 29 CFR 1910.1200(Attached hereto as Exhibit 1)
37. Under Section 2 of the Safety Data Sheet designated Hazards Identification Defendants stated that the GHS Classification of Substance or Mixture as a Category 2 Flammable aerosol; under GHS Label Elements [Hazard picogram(s)] they show a flame in a red box; under "Signal Word" they filed WARNING; under "Hazard statements": they note Flammable aerosol.
38. Said filing states "This chemical is a pesticide product registered by the Environmental Protection Agency and is subject to certain labeling requirements under federal pesticide law. These requirements differ from the classification criteria and hazard information required for safety data sheets, and for workplace non-pesticide chemicals."

39. As a result of the Defendant's breach of the Connecticut Products Liability Statute as herein alleged, the Plaintiff suffered severe and permanent injuries to his bones, muscles, glands, organs, blood vessels, ligaments, soft tissue, tendons, cartilage, and nerves,; all or some of these injuries, or the effects therefrom are, or are likely to be, permanent in nature.

40. As a further result of the wrongful conduct of the Defendants as set forth above, the Plaintiff was forced to undergo and will be forced to undergo in the future, medical care, MRIs, Cat scans and numerous diagnostic procedures, surgery, therapy, medication, medical devices with attendant costs and problems, and other necessary medical treatment with rest and restriction of life's activities.

41. As a further result of the wrongful conduct of the Defendants as set forth herein, the Plaintiff has sustained great pain and suffering, mental anguish and distress of mind and loss of life's enjoyment, and has been and will be hindered and prevented in the future from participating and enjoying the full spectrum of life's activities all to his further loss and damage, and these injuries are, or are likely to be, permanent in nature.

42. As a further result, the Plaintiff has an increased likelihood of future medical problems, complications, disabilities and /or surgeries including by not limited to reconstructive and plastic surgery, with attending maintenance and expense because of Defendants wrongful acts.

43. As a further result, the Plaintiff, who was gainfully employed and owned Monroe Town and Country Veterinary Hospital, has lost time from his employment, hired outside Veterinarians to cover his practice, incurred additional expenses, and may, in the future, lose further time from his employment and other benefits he would have derived therefrom, and may have suffered an impairment of his earning capacity.

44. As a further result of Defendants' actions Plaintiff has suffered major burns and subsequent surgical ostomy with prosthetics with excruciating physical pain and suffering from inception and in the future, as well as emotional pain and suffering, scars and disfigurement causing embarrassment, depression, and other emotional reactions likely caused by such events.

WHEREFORE, THE PLAINTIFF CLAIMS:

1. Compensatory money damages;

2. Damages pursuant to Connecticut General Statutes Sections 52-240a, 52-240b, 52-243 i.e. attorney's fees, punitive damages and costs as set forth in the Connecticut Products Liability act.

                THE PLAINTIFF
                DAVID BASAK-SMITH DVM

BY_____/s/303542_____
        ATTORNEY JOSEPH TRAMUTA
        MINNELLA, TRAMUTA & EDWARDS, LLC
        40 Middlebury Road
        Middlebury CT 06762
        Tel. #: 203-573-1411
        JURIS # 433342

RETURN DATE: JULY 16, 2019          SUPERIOR COURT

DAVID BASAK-SMITH DVM          J.D OF FAIRFIELD/BRIDGEPORT

V.          AT BRIDGEPORT

SPECTRUM BRANDS, INC
UNITED INDUSTRIES CORPORATION          JUNE 12, 2019

## STATEMENT OF AMOUNT IN DEMAND

The Plaintiff in the above-entitled action hereby sets forth that the amount in demand is in excess of FIFTEEN THOUSAND ($15,000.00) DOLLARS.

THE PLAINTIFF
DAVID BASAK-SMITH DVM

BY_____/s/303542_____
ATTORNEY JOSEPH TRAMUTA
MINNELLA, TRAMUTA & EDWARDS, LLC
40 Middlebury Road
Middlebury CT 06762
Tel. #: 203-573-1411
JURIS # 433342